Layne Friedrich (Bar No. 195431)
    E-mail: layne@lawyersforcleanwater.com
Drevet Hunt (Bar No. 240487)
    E-mail: drev@lawyersforcleanwater.com
LAWYERS FOR CLEAN WATER, INC.
1004-A O'Reilly Avenue
San Francisco, California 94129
Telephone: (415) 440-6520
Facsimile: (415) 440-4155

Michael Lozeau (Bar No. 142893)
    E-mail: michael@lozeaudrury.com
LOZEAU | DRURY LLP
410 12th Street, Suite 250
Oakland, California 94607
Telephone: (510) 836-4200
Facsimile: (510) 836-4205

*Attorneys for Plaintiff*
CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation,<br><br>　　　　　Plaintiff,<br><br>　　　v.<br><br>TUOLUMNE UTILITIES DISTRICT, a California Special District,<br><br>　　　　　Defendant. | Civil Case No.: 1:12-CV-01051-AWI-SMS<br><br>**CONSENT DECREE**<br><br><br>Hon. Anthony W. Ishii<br><br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251, *et seq.*)** |

**CONSENT DECREE**

Plaintiff California Sportfishing Protection Alliance ("CSPA"), and defendant Tuolumne Utilities District ("TUD") hereby enter into this Consent Decree.  The entities entering into this Consent Decree are each an individual "Settling Party" and collectively "Settling Parties."

**WHEREAS**, CSPA is a non-profit public benefit corporation dedicated to the preservation, protection, and restoration of the environment, the wildlife and the natural resources of all waters of California, including the San Joaquin River, the Tuolumne River, and the Sacramento-San Joaquin River Delta;

**WHEREAS**, TUD is a California Special District and responsible for the collection, management, treatment, and disposal of sewage in several communities in Tuolumne County;

**WHEREAS**, on April 26, 2012, CSPA issued a 60-day notice letter ("Notice Letter") to TUD. The Notice Letter informed TUD of its alleged violations of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.*, ("Clean Water Act") and of CSPA's intention to file suit against it for these alleged violations.  The Notice Letter specifically notified TUD of its alleged violations of (1) *Waste Discharge Requirements for Tuolumne Utilities District Sonora Regional Wastewater Treatment Plant and Jamestown Sanitary District Jamestown Wastewater Treatment Plant Tuolumne County*, Order No. 5-01-043, NPDES No. CA0084727 (the "2001 NPDES Permit"), (2) *Waste Discharge Requirements for Tuolumne Utilities District Sonora Regional Wastewater Treatment Plant and Jamestown Sanitary District Jamestown Wastewater Treatment Plant Tuolumne County*, Order No. R5-2008-0162, NPDES No. CA0084727 (the "2008 NPDES Permit") and (3) section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), for its unpermitted discharges of raw or partially treated sewage from TUD's sewage collection system to waters of the United States.

**WHEREAS**, on June 26, 2012, CSPA filed its complaint in the United States District Court for the Eastern District of California ("District Court") against TUD, Case No. 1:12-CV-01051-AWI-SMS (hereinafter "Complaint");

**WHEREAS**, TUD denies CSPA's allegations that it has violated the Clean Water Act and/or any of the allegations in the Complaint;

**WHEREAS**, the Settling Parties, through their authorized representatives and without either adjudication of CSPA's asserted claims or admission by TUD of any alleged violation or other wrongdoing, have chosen to resolve this action through settlement and avoid the costs and uncertainties of further litigation;

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Settling Parties each hereby agree as follows:

## I.   GENERAL OBJECTIVES

1.      The objectives of this Consent Decree are:

a.      To ensure that TUD uses, implements, and improves ways, means, and methods to prevent sanitary sewer overflows;

b.      To ensure that TUD uses, implements, and improves ways, means, and methods to ensure protection of groundwater and surface waters while collecting, managing, treating, and disposing of wastewater; and

c.      To ensure that TUD uses, implements, and improves ways, means, and methods to prevent violations of, or comply with, applicable permits, laws, and regulations related to its collection, management, treatment, and disposal of wastewater.

## II.   DEFINITIONS

2.      Unless otherwise expressly defined herein, terms used in this Consent Decree, which are defined in the Clean Water Act, Porter-Cologne, or in regulations implementing these statutes, have the meaning assigned to them in the applicable statutes, regulations, or rules. Whenever terms listed below are used in this Consent Decree, the following definitions apply:

a.      "CCTV" means closed-circuit television.

b.      "TUD" means Tuolumne Utilities District.

c.      "Collection System" means the sewer pipes and lines, manholes or maintenance holes, pump stations, storage facilities, and all appurtenances thereto under

ownership of and/or operation by TUD that are used to convey wastewater generated by residential, commercial, and industrial sources within TUD's service area to the sewage collection system owned and operated by TUD where it is subsequently delivered to the Sonora Regional Wastewater Treatment Plant.

       d.     "Condition Assessment Inspection" means an inspection of a sewer segment by CCTV that results in documentation of a Condition Assessment Rating for the inspected sewer segment. Condition Assessment Inspection does not include CCTV inspection for cleaning quality assurance/quality control, spill follow-up, FOG source investigations, or other types of CCTV inspection unless those inspections yield a Condition Assessment Rating for the entire sewer segment.

       e.     "Condition Assessment Rating" means an assignment of the condition given based on the Pipeline Assessment and Certification Program Standard.

       f.     "day" means a calendar day. In computing any period of time under this Consent Decree, where the last day of such period is a Saturday, Sunday, or Federal or State Holiday, the period runs until the close of business on the next day that is not a Saturday, Sunday, or Federal or State Holiday.

       g.     "FOG" means fats, oil, and grease.

       h.     "PACP" means Pipeline Assessment and Certification Program Standard.

       i.     "Sanitary Sewer Overflow" or "SSO" means any overflow, spill, release, discharge or diversion of untreated or partially treated wastewater from the Collection System. Temporary storage and conveyance facilities (such as vaults, temporary piping, wet wells, construction trenches, impoundments, tanks, etc.) are to be considered part of the sanitary sewer system, and discharges and/or diversions into these temporary storage facilities that do not discharge to waters of the United States are not considered to be SSOs.

       j.     "sewer segment" means any section of publicly owned sewer line or pipe located between: (1) two manholes/maintenance holes; (2) a pump station and a manhole/maintenance hole; (3) a pump station or a manhole/maintenance hole and a headworks structure; or (4) a sewer line or pipe otherwise identifiable as a discrete section.

k.      "SSMP" means the Sanitary System Management Program developed and implemented by TUD for the Collection System, dated March 16, 2010.

### III.      JURISDICTION AND VENUE

3.      For purposes of settlement, the Settling Parties stipulate to the District Court's jurisdiction to enter and retain jurisdiction over the Settling Parties to enforce the terms of this Consent Decree if necessary.

### IV.      EFFECT OF CONSENT DECREE

4.      CSPA does not, by its agreement to this Consent Decree, warrant or aver in any manner that TUD's compliance with this Consent Decree will constitute or result in compliance with any Federal or State law or regulation. Nothing in this Consent Decree shall be construed to affect or limit in any way the obligation of TUD to comply with all applicable Federal, State and local laws and regulations governing any activity required by this Consent Decree.

5.      Nothing in the Consent Decree shall be construed as an admission by TUD, and does not intend to imply any admission as to any fact, finding, issue of law, or violation of law, nor shall compliance with this Consent Decree be construed as an admission by TUD of any fact, finding, conclusion, issue of law, or violation of law.

### V.      APPLICABILITY

6.      The provisions of this Consent Decree apply to and bind the Settling Parties, including any successors or assigns. Each Settling Party certifies that its undersigned representatives are fully authorized to enter into this Consent Decree, to execute it on behalf of the respective Settling Party, and to legally bind the respective Settling Party to its terms. The Settling Parties agree not to contest the validity of this Consent Decree in any subsequent proceeding to implement or enforce its terms.

7.      No change in ownership or corporate or other legal status of TUD or any transfer of TUD's assets or liabilities shall in any way alter the responsibilities of TUD or any of its successors or assigns thereof, under this Consent Decree. In any action to enforce this Consent Decree, TUD shall not raise as a defense the failure by any of its agents, servants, contractors, employees, and successors or assigns to take actions necessary to comply with this Consent

Decree.

## VI.   EFFECTIVE DATE AND TERMINATION DATE

8.     The term "Effective Date" as used in this Consent Decree, shall mean the last date for the United States Department of Justice to comment on the  Consent Decree, i.e., the 45th day following the United States Department of Justice's receipt of the  Consent Decree.

9.     This Consent Decree will terminate eight (8) years from the Effective Date, unless either Settling Party has invoked the Dispute Resolution Procedures pursuant to Section XX of this Consent Decree and the dispute has not been resolved at the time the Consent Decree would otherwise terminate, in which case the Consent Decree shall continue in effect until the dispute is resolved, either through mutual agreement of the Settling Parties or by the Court.

## VII.   WASTEWATER TREATMENT PLANT EFFLUENT DISCHARGE TO WOODS CREEK

10.     Within one hundred eighty (180) days of the Effective Date, TUD shall develop a plan to ensure that treated effluent discharged to Woods Creek meets all applicable terms, limitations, and conditions of the 2008 NPDES Permit. ("Woods Creek Discharge Plan"). The Woods Creek Discharge Plan shall, at a minimum, include provisions that:

   a.   Eliminate discharges of copper in excess of the Effluent Limitations in the 2008 NPDES Permit;

   b.   Eliminate the discharge of zinc in excess of the Effluent Limitations in the 2008 NPDES Permit;

   c.   Eliminate the discharge of ammonia in violation of the Effluent Limitations in the 2008 NPDES Permit;

   d.   Eliminate the discharge of bis(2-ethylhexyl)phthalate exceeding the Criteria for Priority Toxic Pollutants in the State of California, water quality standard (*see* 40 C.F.R. § 131.38); and

   e.   Provide a schedule so that implementation of the Woods Creek Discharge Plan begins within one (1) year of the Effective Date, and full implementation is completed within five (5) years of the Effective Date.

11.     TUD shall submit the Woods Creek Discharge Plan to CSPA within ninety (90) of the Effective Date. CSPA shall provide TUD with written comments and/or revisions to the Woods Creek Discharge Plan within thirty (30) days of receipt of the Woods Creek Discharge Plan.  TUD shall consider each of CSPA's recommended revisions and indicate within twenty (20) days of receipt whether TUD accepts each such recommended revision. For each recommended revision not accepted, if any, TUD shall provide a written explanation for its refusal to accept said revision.  TUD shall implement all agreed upon provisions and/or revisions of the Woods Creek Discharge Plan.  If TUD does not accept each and every one of CSPA's revisions, then CSPA may seek Dispute Resolution Procedures pursuant to Section XX of this Consent Decree.  In any such dispute, TUD shall have the burden of demonstrating that the Woods Creek Discharge Plan, once implemented, will ensure the discharge of wastewater to Woods Creek in compliance with the 2008 NPDES Permit.

12.     TUD shall complete implementation of the Woods Creek Discharge Plan within five (5) years of the Effective Date.

## VIII.   SSO REDUCTION PERFORMANCE STANDARDS

13.     <u>SSO Reduction</u>. It is the goal of this Consent Decree to eliminate SSOs from the Collection System.  TUD shall reduce SSOs from the Collection System as provided in Table 1, which sets forth the number of SSOs per 100 miles of sewer per year ("SSO Reduction Performance Standard") that TUD shall not exceed in a particular year.

**Table 1 – SSO Reduction Performance Standards**

| Year | Maximum Number of SSOs Per 100 Miles of Sewer /Year |
|------|------|
| 2013 | 12 |
| 2014 | 11 |
| 2015 | 9 |
| 2016 | 8 |
| 2017 | 7 |
| 2018 | 6 |
| 2019 | 5 |
| 2020 | 5 |

For purposes of determining compliance with the SSO Reduction Performance Standards, SSOs of twenty (20) gallons or less that do not reach a surface water body shall not be counted.

14.     Compliance with SSO Reduction Performance Standards shall be determined using the miles of sewer (gravity and force mains) reported by TUD in each year's Annual Report required under Section XVII of this Consent Decree.

15.     Failure to meet the SSO Reduction Performance Standard in any particular year shall be a violation of this Consent Decree.

## IX.     SSO REDUCTION ACTION PLAN

16.     TUD shall report any failure to meet the applicable SSO Reduction Performance Standard in each Annual Report. In the event TUD fails to meet the applicable SSO Reduction Performance Standard for any particular year, TUD shall prepare an SSO Reduction Action Plan that shall include, at a minimum:

a.   A description of the location, cause, and volume of the SSOs that lead to the exceedence of the SSO Reduction Performance Standards;

b.   A description of the actions taken in the year for which the Annual Report was submitted that were designed to achieve compliance with the SSO Reduction Performance Standards;

c.   A description of additional measures to be taken during the current year and thereafter to achieve compliance with the SSO Reduction Performance Standards; and

d.   A schedule for implementation of all measures proposed.

17.     TUD shall submit the SSO Reduction Action Plan, if required, to CSPA concurrently with its Annual Report.  CSPA shall provide TUD with written comments and/or revisions to the SSO Reduction Action Plan within thirty (30) days of receipt of the SSO Reduction Action Plan.  TUD shall consider each of CSPA's recommended revisions and indicate within twenty (20) days of receipt whether TUD accepts each such recommended revision. For each recommended revision not accepted, if any, TUD shall provide a written explanation for its refusal to accept said revision.  TUD shall implement all agreed upon provisions and/or revisions of the SSO Reduction Action Plan.  If TUD does not accept each and every one of CSPA's recommendations, then CSPA may seek Dispute Resolution Procedures pursuant to Section XX of this Consent Decree.  In any such dispute, TUD shall have the burden

of demonstrating that the SSO Reduction Action Plan, once implemented, will ensure compliance with the SSO Reduction Performance Standards set forth in Section VIII.

18.     TUD shall begin implementation of any disputed portions of any SSO Reduction Action Plan as an enforceable requirement of this Consent Decree as soon as possible but not more than sixty (60) days following resolution of the disputed portions of the SSO Reduction Action Plan.

## X.     CAPACITY ASSURANCE

19.     Within two (2) years of the Effective Date, TUD shall complete the investigation of all sewer segments identified in Appendix 8-B of its SSMP to ensure sufficient capacity under currently existing conditions up to a 100-year 24-hour storm event.

20.     Within one hundred eighty (180) days of completing the investigation required by Paragraph 19, TUD shall develop a Capacity Assurance Plan that prioritizes and establishes a schedule that ensures completion no later than June 30, 2019 of necessary capacity-related improvements to all sewer segments found to have inadequate capacity during the inspections required by Paragraph 19.

21.     In the Annual Report required under Section XVII of this Consent Decree, TUD shall detail the progress of all actions required by this Section of the Consent Decree over the prior calendar year, and the anticipated schedule of work to be completed on the required capacity improvement projects for the upcoming calendar year.

## XI.    SEWER CONDITION ASSESSMENT/REHABILITATION/REPLACEMENT

22.     By December 31, 2017, TUD shall complete a Condition Assessment Inspection of all gravity sewers in the Collection System that are less than fifteen (15) inches in diameter, that are fifteen (15) years old, or older, and have not been inspected and had their condition assessed within the last ten (10) years. Sewer segments that are less than fifteen (15) inches in diameter and currently less than fifteen (15) years old but which reach the age of fifteen (15) years during the life of this Consent Decree shall also be inspected by CCTV and their condition shall be assessed.

23.     Within one hundred and twenty (120) days of the Effective Date of the Consent

Decree, TUD shall propose to CSPA a schedule for CCTV inspection consistent with Section XI. The schedule shall be prioritized to first inspect areas with known SSO problems and second to systematically CCTV all other lines per basin.

24. Any sewer segment where the passage of the CCTV camera was blocked by conditions in the pipe, which were not present when the sewer segment was first constructed, shall result in the segment being defined as impaired. That segment shall be cleaned and re-insepcted within seventy-two (72) hours and, if permanent repairs are deemed necessary, shall be flushed at least every two (2) months until permanent repairs can be made. The segment shall be repaired within one-hundred twenty (120) days if permanent repairs are deemed necessary. Once the segment is repaired, the segment shall be re-inspected within one (1) year of the repair.

25. During the Condition Assessment Inspection required by this Consent Decree, the quantity of main line gravity sewers shall be recorded, and the condition of each sewer segment inspected shall be documented using the PACP standard Condition Assessment Rating. The Condition Assessment Rating shall be entered into an inspection database (which may be included as part of a larger database). The database shall include the assigned Condition Assessment Rating for all sewer segments inspected, prioritized repair projects, and prioritized rehabilitation/replacement projects. The annual inspection quantity of main line gravity sewers will include the sum of the lengths of all of the gravity sewers where an inspection was completed and a Condition Assessment Rating was made.

26. TUD shall correct observed defects within the timeframes set forth in Table 2 below.

**Table 2 – Timeframe for Actions to Correct Observed Defects**

| Observed Defect | Corrective Action | Time Frame (from date defect observed) | Other Action |
|---|---|---|---|
| PACP Grade 4 or 5 Maintenance Defect | Clean sewer | 60 days | Place on preventive cleaning or treatment schedule as appropriate |
| PACP Grade 3 Maintenance Defect | Clean sewer | 6 months | Place on preventive cleaning or treatment schedule as appropriate |
| PACP Grade 5 Structural Defect – Immediate Failure Likely | Repair or rehabilitate sewer | ASAP (no more than 90 days or 180 days upon showing of inaccessibility beyond TUD's control within 90 days) | N/A |
| PACP Grade 5 Structural Defect – Immediate Failure Unlikely | Repair, rehabilitate, or re-inspect sewer | 3 years | Reinspect within 1 year if corrective action not taken |
| PACP Grade 4 Structural Defect | Repair, rehabilitate, or re-inspect sewer | 6 years | Reinspect within 3 years if corrective action not taken |

27.     In the Annual Report required under Section XVII of this Consent Decree, TUD shall provide information regarding condition assessment, rehabilitation, and replacement, including but not limited to:

      a.   The miles of sewer and number of segments assessed in the previous year;

      b.   The miles of sewer assessed receiving each grade in the PACP grading system; and

      c.   A summary of the mileage of and identification of mainline gravity sewers repaired, rehabilitated and/or replaced during the previous year.

## XII.   FATS, OILS AND GREASE PROGRAM

28.     Within thirty (30) days of the Effective Date, TUD shall modify its current FOG Control Program in the SSMP to include the following terms:

      a.   TUD shall engage in direct residential outreach, consisting of a minimum of

semi-annual mailings, bill stuffers, or hand delivery of leaflets to educate residents that FOG discharges cause SSOs and impose increased costs on the ratepayers. This form of outreach shall also provide residents with best management practices for residential grease control.

     b.   TUD shall distribute door hangers to all homes found to be the cause of a FOG-related SSO to educate residents that FOG discharges cause SSOs and creates increased costs on the ratepayers, and to provide residents with BMPs for residential grease control.  TUD shall distribute door hangers to the appropriate authorities of any apartment complex found to be the cause of a FOG-related SSO for distribution to residents of the apartment complex.

     c.   TUD shall continue to implement its commercial FOG program, which requires the inspection of each of its FOG accounts no less than once a year. FOG accounts found in violation of TUD ordinances shall be re-inspected within thirty (30) days. Repeat violations shall be met with increased enforcement actions as deemed necessary by TUD to enforce compliance and prevent FOG related SSOs.

    29.    TUD shall implement its modified FOG Program.

    30.    In the Annual Report required under Section XVII of this Consent Decree TUD shall at a minimum:

     a.   Summarize its residential and commercial FOG outreach efforts;

     b.   Summarize the results of its commercial FOG program, including the number of FOG accounts in TUD, the number of inspections performed, and the number of FOG accounts found in violation;

     c.   Present TUD's analysis of the effectiveness of its entire FOG program for the previous year; and

     d.   Discuss budget and staffing levels for the previous and current years.

### XIII.   PROACTIVE AND PREVENTIVE CLEANING

    31.    <u>Proactive Cleaning</u>. TUD shall clean all of its main line gravity sewers fifteen (15) inches in diameter or smaller at least once within six (6) years of the Effective Date of this Consent Decree.

    32.    <u>Preventive Cleaning Program</u>. TUD shall improve its Preventive Cleaning

Program as follows:

        a.   Within sixty (60) days of the Effective Date of the Consent Decree, TUD shall implement and use the cleaning and evaluation methodology set forth below in Figure 1 below.

**Figure 1 Preventive Cleaning Scheduling Flow Chart**



b.   TUD shall document, and record in a database, all observations made by its sewer cleaning crew regarding the extent and nature of materials removed during the cleaning process. TUD shall maintain or change the frequency of its preventive cleaning for a sewer segment based on the Sewer Cleaning Results Matrix set forth in Table 3 below, in accordance with the row labeled "Action."

c.   Any segment that experiences an SSO caused by roots, grease, debris, or pipe condition shall be included in the Preventive Cleaning Program at a four (4) month cleaning frequency. Any segment receiving a PACP maintenance grade of four (4) or five (5) during condition assessments shall be included in the Preventive Cleaning Program at a four (4) month

cleaning frequency. Any sewer segment receiving a PACP maintenance grade of three (3) shall be included in the Preventive Cleaning Program at a twelve (12) month cleaning frequency. Any segment that receives a Sewer Cleaning Results Matrix score of "Heavy" based on the Table 3 below, shall be included to the Preventive Cleaning Program at a twelve (12) month cleaning frequency.

**Table 3 - Sewer Cleaning Results Matrix**

|  | Clear | Light | Moderate | Heavy |
|---|---|---|---|---|
| **Debris** | No observable debris | Minor amount of debris, 15 minutes or less to clean, 1 pass. | Less than 5 gallons of debris per line segment, 15-30 minutes to clean, 2-3 passes. | More than 5 gallons of debris per line segment, More than 30 minutes to clean, More than 4 passes, Operator concern for future stoppage. |
| **Grease** | No observable grease | Minor amounts of grease, 15 minutes or less to clean, 1 pass. | Small "chunks" No "logs," 15-30 minutes to clean, 2-3 passes. | Big "chunks" or "logs," More than 30 minutes to clean, More than 4 passes, Operator concern for future stoppage. |
| **Roots** | No observable roots | Minor amounts of roots, 15 minutes or less to clean, 1 pass. | Thin stringy roots No "clumps," 15-30 minutes to clean, 2-3 passes. | Thick roots, Large "clumps," More than 30 minutes to clean, More than 4 passes, Operator concern for future stoppage. |
| **Debris:** Structural pipe fragments soil, rock, etc. | No observable materials | Specify material (if possible), Minor amounts of material. | Specify material, Less than 5 gallons of material per line segment. | Specify material, More than 5 gallons of material per line segment, Operator concern for future stoppage. |

| Action | Decrease frequency to next lower frequency after 2 consecutive CL results (e.g. 6 months to 12 months) | Continue current maintenance frequency. | Increase current maintenance frequency to next higher frequency (e.g. 12 months to 6 months) | Increase current maintenance frequency to next higher frequency (e.g. 12 months to 6 months) |
|---|---|---|---|---|

Note: Time frames for cleaning and quantities of materials removed are based on a 15-inch, 500-foot long segment.

d.   Cleaning Frequency: No reduction in cleaning frequency based upon cleaning results shall be made in a sewer line segment with a previous history of SSOs without the approval of an appropriate collection system maintenance supervisor. Two (2) consecutive results of "clear" may result in the cleaning frequency being reduced to the next lower cleaning frequency. Results of "moderate" or "heavy" will result in the cleaning frequency being increased to the next highest frequency.

e.   If proactive or preventive cleaning of a sewer segment or area cannot be properly accomplished due to pipe condition or access limitations, unless the sewer segment was constructed with such access limitations, the condition of the segment shall be considered failing and shall be repaired within one hundred twenty (120) days.

33.   <u>Sewer Cleaning Quality Assurance/Quality Control Program</u>: TUD shall institute and maintain a quality assurance/quality control ("QA/QC") program adequate to ensure proper and complete cleaning of sewers. The QA/QC program shall consist of spot-checking the cleaning quality in a minimum of two percent (2%) of the cleaned sewer segments on a monthly basis using CCTV to ensure adequate cleaning. If the cleaning is found to be inadequate, the sewer segment will be re-cleaned within thirty (30) days. If any of the spot-checked sewer segments require re-cleaning in any given month, the cleaning crew will be re-trained.

## XIV.   ROOT TREATMENT PROGRAM

34.   Within thirty (30) days of the Effective Date, TUD shall modify its Chemical Root Treatment Program to include a specific commitment and instruction to field crews to only perform chemical applications in compliance with the label instructions. TUD shall thereafter

implement its Chemical Root Treatment Program as described in its SSMP, as a part of TUD's Operations and Maintenance Program.  If a sewer segment listed in the Chemical Root Treatment Program is repaired, rehabilitated, or replaced, it shall no longer be required to be maintained pursuant to this Paragraph.

35.     TUD shall continue to implement its mechanical and hydraulic root control procedures set forth in its SSMP, as part of TUD's Operations and Maintenance Program. If a sewer segment subject to mechanical or hydraulic root control as set forth in TUD's Operations and Maintenance Program is repaired, rehabilitated, or replaced, it shall no longer be required to be maintained pursuant to this Paragraph.

36.     In the Annual Report required under Section XVII of this Consent Decree, TUD shall provide information describing all efforts made and any significant changes to its Chemical Root Treatment Program in the preceding calendar year.

### XV.    PUMP STATION ASSESSMENT AND IMPROVEMENTS

37.     Within one (1) year of the Effective Date, TUD shall prepare a report that evaluates its pump stations ("Pump Station Evaluation") to determine, at a minimum, whether:

a.   Wastewater pumping station structures and electrical and mechanical equipment are protected from physical damage by a one hundred (100) year flood;

b.   The pumping station is readily accessible by maintenance vehicles during all weather conditions;

c.   Backup power source for the alarm systems are provided;

d.   The alarm system is set to activate in cases of power failure, dry well sump and wet well high water levels, pump failure, or any other cause of pump station malfunction for which the alarm system is designed;

e.   Pumping station alarms include identification of the alarm condition that are transmitted to a municipal facility.  If such a facility is not staffed 24-hours a day, and a 24-hour holding capacity is not provided, the alarm shall be transmitted to municipal offices during normal working hours and to the answering service responsible for contacting the person(s) in charge of the lift station during off-duty hours;

f.   Emergency pumping capability, including multiple pumps as necessary, is available unless on-system overflow prevention is provided by adequate storage capacity;

g.   Power generating unit size is adequate to provide power for pump motor starting current and for lighting, ventilation, and other auxiliary equipment necessary for safety and proper operation of the lift station;

h.   Where portable generating equipment or manual transfer is provided, sufficient storage capacity with alarm system is available to allow time for detection of pump station failure and transportation and connection of generating equipment.

38.   TUD shall submit the Pump Station Evaluation to CSPA within fifteen (15) days of its completion. CSPA shall provide TUD with written comments and/or revisions to the Pump Station Evaluation within thirty (30) days of receipt of the Pump Station Evaluation.  TUD shall consider each of CSPA's recommended revisions and indicate within twenty (20) days of receipt whether TUD accepts each such recommended revision.  For each recommended revision not accepted, if any, TUD shall provide a written explanation for its refusal to accept said revision. If TUD does not accept each and every one of CSPA's recommendations, then CSPA may seek Dispute Resolution Procedures pursuant to Section XX of this Consent Decree.  In any such dispute, TUD shall have the burden of demonstrating that the Pump Station Evaluation properly and accurately evaluates each of the required elements.

39.   Within three (3) years of the Effective Date, TUD shall develop and fully implement a plan to correct any deficiencies identified in its Pump Station Evaluation.

### XVI.   CAPITAL IMPROVEMENT PROJECTS

40.   TUD commits to a minimum annual expenditure of at least Three Hundred and Fifty Thousand ($350,000) dollars towards capital improvement projects in the Collection System, not including treatment and disposal costs, beginning in financial 2013 – 2014 year  for the life of this Consent Decree.  For purposes of this Consent Decree, the above minimum annual expenditure dedicated towards collection system capital improvement projects shall only apply to hard costs associated with the collection system improvement such as, materials, equipment, and labor needed to construct the improvement.  Costs related to the design, planning, and/or

permitting of a collection system capital improvement project shall not be counted towards the above annual expenditure amount except for instances where TUD is required to retain a contractor to complete such a capital improvement project.  TUD may determine that is more efficient to undertake one or more large collection system capital improvement projects that may require an investment of several million dollars to complete.  In the event TUD makes such an investment, then TUD will no longer be required to expend a minimum of at least Three Hundred and Fifty Thousand Dollars ($350,000.00) towards collection system improvements in any remaining years of the Consent Decree or until the period of years multiplied by the minimum annual expenditure is equivalent to the cost of the large capital improvement project(s), whichever occurs sooner.  Collection system capital improvement project(s) falling within this Section include projects directed towards eliminating and/or reducing SSOs and include, but are not limited to, main and lateral pipe repair, re-line, and/or replacement, construction of clean outs in laterals, sewer lift station rehabilitation and/or replacement or pump replacement and/or repair, corrosion control for asbestos cement pipes, manhole rehabilitation and replacement; and equipment necessary to carry out such projects.  Expenditures towards collection system improvement projects not directed at eliminating and/or reducing SSOs such as, construction/installation of odor system systems will not be counted against the expenditures contemplated in this Section.  Despite the foregoing, TUD must still comply with the provisions set forth in Section XI of this Consent Decree.  If TUD's financial commitment is insufficient to achieve compliance with this Consent Decree, additional funds may be required.

41.    TUD shall revise its Capital Improvement Program on an ongoing basis to include all sewer lines that receive a PACP grade of five (5) for structural defects.

42.    TUD shall revise its Capital Improvement Program, as necessary, to incorporate any improvements required by this Consent Decree.

## XVII.  ANNUAL REPORT ON COLLECTION SYSTEM

43.    TUD shall submit an Annual Report to CSPA within ninety (90) days after the end of each calendar year that this Consent Decree is in effect.  The Annual Report shall provide details relevant to TUD's implementation of, and compliance with, this Consent Decree during

the preceding year, including:

    a.  A statement and explanation of TUD's compliance or non-compliance with the SSO Reduction Performance Standard for the preceding year (compliance with the SSO Reduction Performance Standard shall be determined by using the miles of sewer in TUD's Collection System);

    b.  Any program modifications or delays during the preceding year;

    c.  CCTV inspection schedules in the upcoming year for inspection of gravity sewers;

    d.  A statement of:

        i.  the miles of sewer that were assessed in the preceding year;

        ii.  the miles of sewer assessed receiving each grade in the PACP grading system;

        iii.  a summary of the mileage of and identification of sewers repaired, rehabilitated, and/or replaced during the preceding year;

        iv.  necessary information to assess whether the timeframes from Table 2 have been met, and a statement of compliance (or non-compliance) with these timeframes; and

    e.  Identification of the sewer segments cleaned, and the results of TUD's QA/QC program for the preceding year.

## XVIII. REIMBURSEMENT OF LITIGATION COSTS, MONITORING OF CONSENT DECREE, AND MITIGATION PAYMENT

    44.  <u>Litigation Fees and Costs</u>. To help defray CSPA's attorneys, consultant, and expert fees and costs, and any other costs incurred as a result of investigating, filing this action, and negotiating a settlement, TUD shall pay CSPA the sum of One Hundred Fifty Thousand Dollars ($150,000.00) which shall include all attorneys' fees and costs for all services performed by and on behalf of CSPA by its attorneys and consultants up to and through the Effective Date of this Consent Decree.  Payment shall be made within thirty (30) days of the Effective Date of this Consent Decree and made payable to "***Lawyers for Clean Water Attorney Client Trust Account***." The payment shall be sent via overnight delivery addressed to: 1004-A O'Reilly

Avenue, San Francisco, California 94129, and shall constitute full payment for all costs of litigation incurred by CSPA that have or could have been claimed in connection with or arising out of CSPA's lawsuit, up to and including the Effective Date.

45.      Compliance Monitoring. To compensate CSPA's legal and/or technical consultants time reviewing compliance reports and monitoring TUD's compliance with the terms of this Consent Decree, TUD shall pay Fifty Thousand Dollars ($50,000.00).  Payment shall be made within forty-five (45) days of the Effective Date of this Consent Decree and made payable to "**_Lawyers for Clean Water Attorney Client Trust Account,_**" and sent via overnight deleivery to: 1004-A O'Reilly Avenue, San Francisco, California 94129.  The compliance monitoring funds are not intended to cover or reimburse CSPA or its representatives for time or expenses incurred by CSPA or its representatives resolving alleged breaches of the Consent Decree.  The Compliance Monitoring funds assumes TUD will not violate the Consent Decree, any compliance monitoring time or costs incurred in resolving disputes or alleged violations are subject to reimbursement consistent with Paragraph 54 below.

46.      Mitigation Payment. To remediate alleged environmental harms resulting from the allegations in the Complaint, TUD shall pay to the Rose Foundation for Communities and the Environment the total sum of One Hundred Forty Thousand Dollars ($140,000.00) ("the Mitigation Payment") to be used to fund environmental project activities that will benefit the Sacramento-San Joaquin River Delta and its watershed, including the South Fork Stanislaus River, the Tuolumne River, Sullivan Creek, Woods Creek, Chicken Creek, Turnback Creek, and/or Power Creek.  The Mitigation Payment shall be made within sixty (60) days of the Effective Date of this Consent Decree, and mailed to: Rose Foundation for Communities and the Environment, 6008 College Avenue, Oakland, California 94618, Attention: Tim Little.

**XIX.   SUBMISSION OF CONSENT DECREE FOR AGENCY REVIEW**

47.      CSPA shall submit a copy of this Consent Decree to EPA and the United States Department of Justice ("DOJ") within three (3) days of its execution for agency review consistent with 40 C.F.R. § 135.5.

48.      If EPA or DOJ comment negatively on the provisions of this Consent Decree, the

Settling Parties agree to meet and confer to attempt to resolve the comment(s) raised by EPA or DOJ.

## XX.   BREACH OF CONSENT DECREE AND DISPUTE RESOLUTION PROCEDURES

49.     Force Majeure. TUD shall notify CSPA pursuant to the terms of this Paragraph, when implementation of the requirements set forth in this Consent Decree, within the deadlines set forth in this Consent Decree, becomes impossible, despite the timely good-faith efforts of TUD, due to circumstances beyond the control of TUD or its agents, and which could not have been reasonably foreseen and prevented by the exercise of due diligence by TUD.  Any delays due to TUD's failure to make timely and bona fide applications and to exercise diligent efforts to comply with the terms in this Consent Decree in normal inclement weather shall not, in any event, be considered to be circumstances beyond TUD's control.  Financial inability shall not, in any event, be considered to be circumstances beyond TUD's control.

50.     If TUD claims Force Majeure, it shall notify CSPA in writing within thirty (30) days of the date that TUD first knew of the event or circumstance that caused or would cause a violation of this Consent Decree, or the date TUD should have known of the event or circumstance by the exercise of due diligence.  The notice shall describe the reason for the nonperformance and specifically refer to this Section of this Consent Decree.  It shall describe the anticipated length of time the delay may persist, the cause or causes of the delay, the measures taken or to be taken by TUD to prevent or minimize the delay, the schedule by which the measures will be implemented, and the anticipated date of compliance. TUD shall adopt all reasonable measures to avoid and minimize such delays.

a.   The Settling Parties shall meet and confer in good-faith concerning the non-performance and, where the Settling Parties concur that performance was or is impossible, despite the timely good faith efforts of TUD, due to circumstances beyond the control of TUD that could not have been reasonably foreseen and prevented by the exercise of due diligence by TUD, new performance deadlines shall be established.

b.   If CSPA disagrees with TUD's notice, or in the event that the Settling Parties

cannot timely agree on the terms of new performance deadlines or requirements, either Settling Party shall have the right to invoke the Dispute Resolution Procedures pursuant to Section XX of this Consent Decree.   In such proceeding, TUD shall bear the burden of proving that any delay in performance of any requirement of this Consent Decree was caused or will be caused by Force Majeure and the extent of any delay attributable to such circumstances.

51.   <u>Informal Dispute Resolution Procedures</u>. The Settling Parties agree to engage in Informal Dispute Resolution Procedures pursuant to the terms of this Paragraph:

a.   If a dispute under this Consent Decree arises, or any Settling Party believes that a breach of this Consent Decree has occurred, the Settling Parties shall meet and confer (telephonically or in-person) within ten (10) days of receiving written notification of a request for such meeting.   During the meet and confer proceeding, the Settling Parties shall discuss the dispute and make best efforts to devise a mutually acceptable plan, including implementation dates, to resolve the dispute.   The Settling Parties may, upon mutual written agreement, extend the time to conduct the meet and confer discussions beyond ten (10) days.

b.   If any Settling Party fails to meet and confer within the timeframes set forth herein, or the meet and confer does not resolve the dispute, after at least ten (10) days have passed after the meet and confer occurred or should have occurred, either Settling Party shall be entitled to initiate the Formal Dispute Resolution Procedures outlined below.

52.   <u>Formal Dispute Resolution Procedures</u>. The Settling Parties agree that Formal Dispute Resolution Procedures shall be initiated by filing a Motion to Show Cause or other appropriately titled motion ("Motion") in the United States District Court, Eastern District of California, before the Honorable Judge Anthony W. Ishii, or the District Court Judge otherwise assigned to his matter at that time.   The purpose of the Motion is to determine whether either party is in breach of this Consent Decree and, if so, to require the breaching party to remedy any breach identified by the District Court.   The Settling Parties agree to stipulate to an expedited review of the Motion by the Court if requested by any Settling Party.   If Anthony W. Ishii is not available to perform the role identified herein, the Settling Parties agree that the Motion shall be

re-assigned pursuant to applicable rules of the District Court.

53.     The Settling Parties agree that any action or proceeding which is brought by any Settling Party against any other Settling Party pertaining to, arising out of or related to the requirements of this Consent Decree shall first use the Informal Dispute Resolution Procedures meet and confer proceedings set forth in Paragraph 51 and, if not successful, the Settling Parties shall use the Formal Dispute Resolution Procedures in Paragraph 52.  Unless otherwise specifically provided for in this Consent Decree, the Dispute Resolution Procedures set forth in Paragraphs 51 and 52 shall be the exclusive mechanism for resolving disputes between the Settling Parties with regard to any aspect of this Consent Decree.

54.     Litigation costs and fees incurred in addressing and/or resolving any informal or formal dispute, including an alleged breach of this Consent Decree, shall be awarded in accordance with the standard established by section 505 of the Clean Water Act, 33 U.S.C. § 1365, and case law interpreting that standard.

## XXI.   STIPULATED PAYMENTS

55.     TUD shall pay the following stipulated payments if it files a late or incomplete report required by this Consent Decree:

a.   One Hundred Dollars ($100) per day until the complete report is submitted, up to thirty (30) days for a total amount of Three Thousand Dollars ($3,000).

b.   After thirty (30) days, Two Hundred Dollars ($200) per day until the complete report is submitted, up to thirty (30) days for a total of an additional Six Thousand Dollars ($6,000).

c.   After sixty (60) days, Three Hundred Dollars ($300) per day until the complete report is submitted, up to Nine Thousand Dollars ($9,000).

d.   The above payments are cumulative, as applicable, to a maximum payment of eighteen Thousand Dollars ($18,000) per report.

56.     CSPA may but is not obligated to notify TUD of a missed deadline or an outstanding stipulated payment.  TUD shall invoke the Dispute Resolution Proecedures pursuant to Section XX of this Consent Decree if it has a disagreement over it obligation to make the

stipulated payment.  If TUD has not already made the stipulated payment, TUD shall make it within ten (10) days of receipt of CSPA's invoice itemizing the stipulated payment liability, or within thirty (30) days after resolution of the Dispute Resolution Procedures invoked pursuant to Section XX of this Consent Decree.

57.    All stipulated payments described in this Consent Decree shall be paid by TUD to: Rose Foundation for Communities and the Environment, 6008 College Avenue, Oakland, California 94618, Attention: Tim Little.

58.    Nothing in this Consent Decree shall prevent CSPA from waiving any stipulated payments, which might be due under this Section, based on the outcome of the Informal Dispute Resolution Procedures, or based on TUD's good faith efforts.

## XXII.  NOTICES AND SUBMISSIONS

59.    TUD agrees to provide CSPA with all documents or reports required by this Consent Decree.  All documents shall be directed to the following individuals at the addresses specified below unless specifically stated otherwise herein. Any change in the individuals or addresses designated by any party must be made in writing to all Settling Parties.

If to CSPA:

> Drevet Hunt
> Lawyers for Clean Water, Inc.
> 1004 O'Reilly Avenue
> San Francisco, California 94129
> Telephone: (415) 440-6520
> Email: drev@lawyersforcleanwater.com

> Bill Jennings
> 3536 Rainier Avenue
> Stockton, California 95204
> Telephone: (209) 464-5067
> Email: deltakeep@me.com

If to Tuolumne Utilities District:

> Kanwarjit (Jit) S. Dua
> Somach Simmons & Dunn
> 500 Capitol Mall, Suite 1000
> Sacramento, California 95814

Telephone: (916) 446-7979
Email: kdua@somachlaw.com

Peter Kampa, General Manager
Tuolumne Utilities District
18885 Nugget Blvd.
Sonora, California 95370
Telephone: (209) 532-5536
Email: pkampa@tuolumneutilities.com

60.     TUD also agrees to make available to CSPA any existing documents within TUD's custody or control that are reasonably necessary to evaluate system performance and/or compliance with this Consent Decree within thirty (30) days of written request by CSPA.

61.     During the life of this Consent Decree, TUD shall preserve at least one legible copy of all records and documents, including computer-stored information, which relate to performance of its obligations under this Consent Decree.

62.     Any notice, report, certification, data presentation or other document submitted by TUD to CSPA pursuant to this Consent Decree, which discusses, describes, demonstrates, or supports any finding or makes any representation concerning compliance or non-compliance with any requirement(s) of this Consent Decree, shall contain the following certification, signed and dated by a responsible official:

> I certify, under penalty of perjury, that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted and is, to the best of my knowledge and belief, true, accurate and complete.

## XXIII. MUTUAL RELEASE OF LIABILITY

63.     Upon the District Court's approval and entry of this Consent Decree, the Settling Parties and their successors, assigns, directors, officers, agents, attorneys, representatives, and employees, release all persons, including TUD, CSPA, and their respective officers, employees, agents, attorneys, representatives, contractors, predecessors, successors and assigns, past and present, from, and waives all claims, for injunctive relief, damages, penalties, fines, sanctions, mitigation, fees (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed in this action, up to the Effective Date of this Consent Decree.  This

release includes a release, and covenant not to sue, for any claims of injunctive relief, damage,

penalties, fines, sanctions, mitigation, fees (including fees of attorneys, experts and others),

costs, expenses or any other sum incurred or claimed based on facts or allegations set forth in the

Notice Letter and/or Complaint up to the Effective Date of this Consent Decree.

64.     Nothing in this Consent Decree limits or otherwise affects CSPA's right to

address or take any position that it deems necessary or appropriate in any formal or informal

proceeding before any judicial or administrative body on any other matter relating to TUD.

## XXIV. MISCELLANEOUS PROVISIONS

65.     <u>Construction</u>. The language in all parts of this Consent Decree shall be construed

according to its plain and ordinary meaning, except as to those terms defined in Section II above.

66.     <u>Choice of Law</u>. The laws of the United States shall govern this Consent Decree.

67.     <u>Severability</u>. In the event that any provision, Paragraph, Section, or sentence of

this Consent Decree is held by a Court to be unenforceable, the validity of the enforceable

provisions shall not be adversely affected.

68.     <u>Counterparts</u>. This Consent Decree may be executed in any number of

counterparts, all of which together shall constitute one original document. Telecopy, scanned

copies (i.e., pdf) and/or facsimile copies of original signature shall be deemed to be originally

executed counterparts of this Consent Decree.

69.     <u>Modification of the Consent Decree</u>. This Consent Decree, and any provisions

herein, may not be changed, waived, discharged, or terminated unless by a written instrument,

signed by the Settling Parties.

70.     <u>Full Settlement</u>. This Consent Decree constitutes a full and final settlement of this

matter.

71.     <u>Integration Clause</u>. This is an integrated Consent Decree. This Consent Decree is

intended to be a full and complete statement of the terms of the agreement between the Settling

Parties and expressly supersedes any and all prior oral or written agreements, covenants,

representations, and warranties (express or implied) concerning the subject matter of this

Consent Decree.

1    The Settling Parties hereby enter into this Consent Decree.

2  APPROVED AS TO CONTENT:

3  Date: __April 4, 2013_____          CALIFORNIA SPORTFISHING
                                            PROTECTION ALLIANCE
4

5                                  By:   __/s/ Bill Jennings (authorized on April 4,__
   __2013)__
6                                        Bill Jennings
                                         Executive Director
7

8  Date:__April 9, 2013_____     TUOLUMNE UTILITIES DISTRICT

9                                  By:   __/s/ Michael Sarno (authorized on April 9,__
   __2013)__
10                                       Michael Sarno
                                         Board President
11

12 APPROVED AS TO FORM:

13

14 Date: __April 11, 2013_____     LAWYERS FOR CLEAN WATER, INC.

15
                                   By:   _____/s/_____
16                                       Layne Friedrich
                                         Drevet Hunt
17                                       Attorneys for Plaintiff
                                         California Sportsfishing Protection Alliance
18

19 Date:__April 15, 2013_____     SOMACH SIMMONS & DUNN

20
                                   By:   __/s/ Kanwarjit Dua__
21                                       Kanwarjit S. Dua
                                         Attorneys for Defendant
22                                       Tuolumne Utilities District

23

24 IT IS SO ORDERED.

25
   Dated: __June 4, 2013___         _____
26
                                    SENIOR  DISTRICT  JUDGE
27

28

---